IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JAMES LANGRELL,<br><br>                Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>                Defendant. | **8:18CV57**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the defendant's motion for summary judgment, Filing No. 33. This is an action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*. The plaintiff worked as a brakeman/conductor at defendant Inion Pacific Railroad Company ("U.P." or "the Railroad") for over 20 years. He alleges that while employed at U.P., he was negligently exposed to various toxic substances and carcinogens that caused or contributed to his development of squamous cell tonsil cancer.

In its motion for summary judgment, U.P. contends the plaintiff's action is barred by a release executed in 1999.

I.    FACTS

The plaintiff does not dispute the defendant's statement of facts. *See* Filing No. 34, Defendants' Brief at 2-4; Filing No. 51, Plaintiff's Brief at 2. Accordingly, the parties agree to the following: plaintiff James Langrell was born on June 28, 1947. Langrell was hired by the St. Louis Southwestern Railroad, which was nicknamed the Cotton Belt Railroad, in 1970. He left the Cotton Belt in 1988 when he took a buyout. He later returned to railroading and worked with the Southern Pacific Railroad, which later

1

became Union Pacific Railroad. Throughout his Union Pacific career, Langrell worked in the transportation craft. Over the course of his career, Langrell rode on trains as either a brakeman or a conductor.

In 1997, Langrell suffered a career-ending injury. Langrell settled with the railroad after filing a lawsuit. Langrell signed a release of claims. As consideration for the release and settlement, Union Pacific paid Langrell $425,000.00. The release Langrell signed contained the following language:

> I further acknowledge that I have entered into this compromise settlement and give this release with full knowledge and understanding of the nature and legal effect explained to me by my attorney, and that I know, understand and intend that in and by so doing I am completely and forever barring myself from asserting, prosecuting or recovering upon any claim or demand whatsoever against Union Pacific Railroad Company, its agents, servants and employees, and all other persons, firms and corporations liable or claimed to be liable on account of said accident, and any past, present and/or possible future consequences or results of said accident and also any and all other personal injury claims or grievances of any nature whatsoever, including, but not limited to, labor disputes, hearing loss, repetitive trauma, chemical exposure, and exposure to diesel fumes growing out of my employment.

Filing No. 35-3, Ex. 3, General Release at 2; *see also* Filing No. 43-13, Ex. 13, General Release at 3.

Langrell had the opportunity to negotiate, read, and analyze the release. He was represented by an attorney when he signed the release. Langrell stated in the release language that his attorney explained the legal effect of the release to him. Langrell had the opportunity to review the release with his attorney and ask questions about the meaning of the language.

Almost twenty years after he left the railroad, Langrell learned that he had squamous cell carcinoma in his left tonsil in October 2014. Langrell filed suit against

Union Pacific, claiming that while working at Union Pacific he was exposed to chemicals and diesel fumes that caused or contributed to his cancer.

The record shows that in the opening paragraph of the General Release, Langrell agreed to release U.P. from:

> all suits, actions, causes of action, claims and demands of every character whatever that I now have , or may hereafter have, . . . under any federal, state or local laws, ordinances or regulations, or personal injury claims or grievances of any nature whatever arising from my employment by Union Pacific Railroad Company as of the date of this agreement and *arising out of, or to arise, or grow out of, any and all injuries to person and damages to property in consequence of, or in any way connected with, an accident which occurred on or about the 18th day of February, 1997, at or near McNeil, Arkansas* resulting in personal injuries which, I claim, have totally and permanently disabled me from ever performing the duties of my employment.

Filing No. 43-13, Ex. 1, General Release at 1 (emphasis added). The release further provides:

> That in determining said consideration there has been taken into consideration not only the ascertained injuries, disabilities and damages but also the possibility that the injuries sustained may be permanent and progressive and recovery therefrom uncertain and indefinite, so that consequences not now anticipated *may result from the said accident*, and for the consideration of the amount aforementioned, it is the express intention and desire of the undersigned to release, discharge and acquit Union Pacific Railroad Company, their agents, servants and employees, and all other persons, firms and corporations liable, or who might be claimed liable, from any and all claims, demands and choses in action *arising from the injuries, disabilities and damages sustained in the said accident* which are uncertain, indefinite and the consequences of which are not now anticipated.

*Id.* (emphasis added). At his deposition, the plaintiff testified the accident involved his jumping off a train that was going thirty miles an hour. Filing No. 35-2, Deposition of James Langrell ("Langrell Dep.") at 123-24. He injured his knees, elbow, and neck. *Id.* at 123. The release at issue was a settlement of a lawsuit in connection with that

incident. *Id.* at 127-28. The release also states that Langrell claimed to be totally and permanently disabled from ever performing the duties of his employment and he waived all rights to return to active service. Filing No. 43-13, Ex. 3, General Release at 1. Langrell testified he was generally aware of exhaust fumes, asbestos-insulated pipes, diesel spills, and blowing silica or sand, and at various times he smelled diesel fuel, creosote and diesel exhaust. Filing No. 35-2, Langrell Dep. at 69-74, 77-79, 83-85, 98-100, 126, 164, 166, 169.

II. LAW

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042, (8th Cir. 2011) (*en banc*) (quoting Celotex, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Celotex, 477 U.S. at 324).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

The validity of a release under the FELA is determined in accordance with federal law. *Dice v. Akron, Canton & Youngstown Ry. Co.*, 342 U.S. 359, 361 (1952); *see also Maynard v. Durham & S. Ry. Co.*, 365 U.S. 160, 161 (1961). Under § 5 of the FELA, any contract where the purpose is to "exempt" an employer from "any liability" under FELA is void. 45 U.S.C. § 55; *see CSX Transp., Inc. v. McBride*, 564 U.S. 685, 708 (Roberts, J., dissenting) ("FELA expressly abrogated common law tort principles in four specific ways . . . [FELA] barred employees from contractually releasing their employers from liability.").

However, "[w]here controversies exist as to whether there is liability, and if so for how much," a release is not a device to exempt from liability but is a means of compromising a claimed liability, and is not precluded by § 5 of the FELA, 45 U.S.C. § 55. *Callen v. Penn. Ry. Co.*, 332 U.S. 625, 630, (1948); *see also Sea-Land Serv., Inc. v. Sellan*, 231 F.3d 848, 851 (11th Cir. 2000) (explaining that 45 U.S.C. § 55 prevents employers from restricting FELA rights as a condition of employment). Thus, "a release

5

of FELA claims can have the same effect as any other release, in that it may constitute a settlement or compromise, rather than an attempt to escape liability." *Babbitt v. Norfolk & W. Ry. Co.*, 104 F.3d 89, 92 (6th Cir.1997). The plaintiff bears the burden of establishing that a release is void under § 5 of the FELA. *Callen*, 332 U.S. 630.

There is a split in authority as to the validity of a release of future claims under the FELA. *Compare Babbitt*, 104 F.3d at 93 (holding that a release is not valid if it exempts the railroad from liability for future, undiagnosed injuries) *with Wicker v. Consol. Rail Corp.*, 142 F.3d 690, 701 (3rd Cir. 1998) (holding that a release may be valid if it exempts the railroad from liability for future, undiagnosed injuries as long it is executed for valid consideration as part of a settlement and the scope of the release is limited to those risks that are known to the parties at the time the release is signed).

In the Sixth Circuit, under the bright-line *Babbitt* standard, in order to be valid, "a release must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." *Babbitt*, 104 F.3d at 93. In contrast, the Third Circuit applies a fact-intensive approach and holds that the release is limited to those risks that are known to the parties at the time of the release and are risks the employee intends to release. *Wicker*, 142 F.3d at 701. Under *Wicker*, "[c]laims relating to unknown risks do not constitute 'controversies,' and may not be waived under [§ 55] of FELA." *Id.* A sufficient release "spells out the quantity, location and duration of potential risks to which the employee has been exposed—for example toxic exposure—allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries[.]" *Id.*

6

Even under the *Wicker* approach, releases that mechanically detail a laundry list of diseases or hazards that could conceivably be encountered by a railroad worker are viewed skeptically and are not conclusive of the parties' intent. *Id.* (finding that a release that "merely recite a series of generic hazards to which [the plaintiffs] might have been exposed, rather than specific risks the employees faced during the course of their employment" does "not demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released."). Where a specific known risk or malady is not mentioned in the release, it is difficult for the employer to show it was known to the employee and that he or she intended to release liability for it. *Id.* "[W]here a release merely details a laundry list of diseases or hazards, the employee may attack that release as boilerplate, not reflecting his or her intent." *Id.*

Also, some courts find there is no need to select between the two tests to evaluate the validity of a release under § 5 of the FELA because "the *Babbitt* and *Wicker* cases actually set out different standards to be applied in different circumstances." *See, e.g., Ratliff v. Norfolk S. Ry. Co.*, 680 S.E.2d 28, 38 (W. Va. 2009). The "distinction lies with the posture of the employee in executing a release," with *Wicker* applying to cases where an employee executes a release in connection with the negotiation of a FELA claim, and *Babbitt* applying when the employee was not negotiating the settlement of a claim but executed a general release in the context of participating in a voluntary separation program. *Id.*; *see also Wicker,* 142 F.3d at 700 (noting that the *Babbitt* holding "was based in part on the fact that the releases formed part of a voluntary separation program, and were not the product of negotiations settling a claim."); *Wells v. Union Pac. R.R. Co.*, No. 9:07cv27, 2008 WL 4500735, at *4 (E.D.

7

Tex. 2008) (distinguishing the release at issue—executed in connection with a prior claim of injury—with that at issue in *Babbitt* which it involved a release that was executed as part of an early retirement program).

Further, it is not a violation of the FELA to for an employer, as part of a bargained-for settlement of a claim for a specific injury, to enter into an agreement "designed to make sure that a totally disabled" employee would not work for the employer in the future. *Sea-Land Serv., Inc.,* 231 F.3d at 851 (involving Jones Act and holding the common carrier employer could bargain for an agreement settling a claim of total and permanent disability that barred the employee from future employment on its vessels). Such an agreement is intended both to prevent the plaintiff from suffering re-injury and for the employer to avoid paying again what had already been paid. *Id.* at 852 (noting that under the agreement, the plaintiff was paid both for his current expenses and for his entire work-life expectancy). The risk contemplated by the parties in settling a claim for damages sustained for specific injuries under those circumstances is the risk of re-injury. *Id.* at 852-53 (also noting that the settlement agreement included provisions forbidding future employment by a totally disabled seaman that would expose him to known and unacceptable risks).

III. DISCUSSION

The Court finds the release at issue does not preclude the plaintiff's toxic-exposure claim. Under the rationale expressed in *Callen*, *Babbitt*, and *Wicker*, a release must about a "controversy" on the railroad's liability, and/or the extent of that liability, for a particular accident or exposure. This means that a valid release under FELA must relate to a specific claim. Even under the more expansive holding of

*Wicker*, which permits the release of known risks, as opposed to injuries, a valid release must address a specific instance of disputed liability. In other words, a release that evidences an intent to preclude a claim that is unrelated to the one compromised will be void under 45 U.S.C. § 55 because there is no controversy or dispute about a potential claim for the parties to settle.

The only injuries known to Langrell at the time Langrell signed the release were the injuries to his knees, elbow and neck suffered as a result of jumping from the train. There is no evidence that the plaintiff was aware at that time of any a toxin-induced injury or cancer. Clearly, under the *Babbitt* approach, extending the release to cover injuries other than those incurred in the accident would be an impermissible "attempt to extinguish potential future claims." *Babbitt*, 104 F.3d at 93. The language of the release clearly reflects that it was a bargained-for settlement flowing out of the plaintiff's accident and injuries at or near McNeil, Arkansas. The release Langrell signed in 1999 would not bar him from pursuing a claim for a later-discovered injury that was not related to the train-jumping accident.

Further, even under *Wicker*, the release would not preclude a claim injuries that result from toxic exposure. The release does not "chronicle[ ] the scope and duration" of the plaintiff's toxic exposures so as to show an intent to release U.P. from liability for future risk of injury from those hazards. There is no evidence in the record that indicates the plaintiff made a reasoned decision to release a claim for cancer as the result of alleged toxic exposures. The only evidence U.P. has submitted on this issue is the boilerplate language in the release itself, which includes the terms "chemical exposure" and "exposure to diesel fumes" among a laundry list of other injuries and

9

potential disputes. Toxic exposure is listed simply as a generic hazard, and the release makes no mention of the specific risk the employee faced—developing cancer. Also, the boilerplate language in the closing paragraph of the release is contrary to several other statements in the document that specifically limit the coverage of the release to the present and future injuries, disabilities, consequences, and damages sustained in the accident near McNeil, Arkansas in 1997.

The release at issue is similar to one of the releases found void as a matter of law in *Wicker*. *Id.*, 142 F.3d at 701 (finding that detailed, blanket releases that attempted to cover all potential liabilities, but "merely recited a series of generic hazards to which [the plaintiffs] might have been exposed, rather than specific risks the employees faced during the course of their employment" did not "demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released."). As noted in *Wicker*, a release itself can be strong, but not conclusive, evidence of the parties' intent. *Id.* Other than a single boilerplate sentence in the closing paragraph, the release at issue here contains nothing that indicates the plaintiff intended to release U.P. from liability from anything other than risks (including risks of uncertain new injuries or exacerbation of injuries) connected to the accident that occurred in 1997. It is a general release expressly limited to all claims plaintiff had or could have against the railroad as a result of an incident that occurred in a particular location on a specified date. *See, e.g., Wells,* No. 9:07CV27, 2008 WL 4500735, at *4 (E.D. Tex. Oct. 3, 2008) (finding that by its express terms, the release would only be applicable to the plaintiff's current FELA claim if he sought relief for an injury that arose out of the accident that was the subject of the compromise and

settlement). There is no dispute that the accident is not connected in any way to the alleged exposures to carcinogens.

U.P. argues that 45 U.S.C. § 55 "should have no application when a railroader agrees not to return to the railroad for work." Filing No. 34, Defendant's Brief at 8. It argues "[t]he release does not absolve the railroad from future injuries suffered by Langrell. Rather, it acknowledges that Langrell will no longer be employed at the railroad and as a result he was settling all claims at that time for negligent acts that occurred during his past employment." *Id.* at 9. The Court finds U.P.'s argument is misplaced. Although the plaintiff also waives any rights to return to active service with the railroad in the release, he does so in the context of being permanently disabled, not as part of a voluntary separation, buyout, or reduction in force. Langrell's agreement not to return to work is an implicit acknowledgement that the known risk he released under the agreement was re-injury or exacerbation of the permanently disabling injuries he suffered in the 1997 accident. *See, e.g., Sea-Land*, 231 F.3d at 852.[1] The relatively large amount of the settlement indicates that Langrell was compensated both for his current expenses and for his entire work-life expectancy. *See id.* Like the release at issue in *Sea-land*, the release at issue here "compromised a claim of permanent total disability and attempted to prevent a re-injury to [the plaintiff], which would result in detriment to him and to [the employer]." *Id.* at 851. The release may be valid and enforceable to the extent that it prevents Langrell's return to work at U.P. or precludes recovery for new injuries or aggravated injuries connected to the 1997 accident. That

---

[1] That case involved a seaman who breached an agreement similar to that at issue herein by returning to work on a vessel and attempting to recover for re-injury of the back injury that was the subject of the agreement. *Sea-Land*, 231 F.3d at 851-52. The court found the agreement was enforceable, did not violate the FELA and precluded the plaintiff's action. *Id.* at 853.

11

does not mean that the release operates to preclude an action based on a risk of developing cancer that was unknown to Langrell at the time he signed the release. There is no evidence that Langrell knew of or intended to release U.P. from liability for harm from toxic exposures. Although the plaintiff testified that he was generally aware of some exposures to chemicals over the course of his employment, U.P. did not present evidence that Langrell knew of the risk of harm, specifically cancer, from such exposures.

Even though there is no factual dispute that the agreement was reached during settlement negotiations, and the plaintiff was represented by counsel, the release does not demonstrate the parties understood—let alone addressed or discussed—that Langrell was releasing any claims other than those related to the accident. The release at issue is therefore void under either *Babbit* or *Wicker*. In fact, the release at issue is a dreaded "laundry list" general release that is disfavored under both approaches.

The Court finds the release does not pass muster under 45 U.S.C. § 55, and is therefore ineffective under the FELA to preclude the plaintiff's claim against U.P. for an injury in the nature of cancer. In summary, Union Pacific is not entitled to judgment in its favor as a matter of law. Accordingly,

IT IS ORDERED that the Defendant's motion for summary judgment (Filing No. 33) is denied.

Dated this 5th day of June, 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge